**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

**AMY BRAILER**
203 5th Avenue
Glen Burnie, MD 21061
*Resident of Anne Arundel County*

**LAUREN BROWN**
901 Jay Court
Glen Burnie, MD 21061
*Resident of Anne Arundel County*

**KASEY DOLCH**
1020 Cape Splitt Harbour
Pasadena, MD 21122
*Resident of Anne Arundel County*

       Plaintiffs,

***Individually and on Behalf of All***
***Similarly Situated Employees***

v.

**CLEARCOMM BAWA, INC.**
7553 Governor Ritchie Highway
Glen Burnie, MD 21061

Serve:  Yousef Sihweil
        7694 Dorchester Boulevard
        Apt. 1107
        Hanover, MD 21076

**CLEARCOMM, INC.**
7480 Bryan Dairy Road
Suite 550
Largo, FL 33777

Serve:  Sihweil, Yousef
        7480 Bryan Dairy Road
        Suite 550
        Largo, FL 33777

**YOUSEF SIHWEIL**

Jury Trial Requested

Class Action/Collective Action

Civil Action No.:

1910 Town Centre Boulevard
Unit 820
Annapolis, MD 21401
*Resident of Anne Arundel County*

**SAWSAN SIHWEIL**
1910 Town Centre Boulevard
Unit 820
Annapolis, MD 21401
*Resident of Anne Arundel County*

Defendants.

## COLLECTIVE ACTION COMPLAINT FOR WAGES OWED

AMY BRAILER, KASEY DOLCH and LAUREN BROWN, Plaintiffs, by and through their undersigned counsel and The Law Offices of Peter T. Nicholl, on behalf of themselves and all others similarly situated, hereby submit their Complaint against CLEARCOMM BAWA, INC., CLEARCOMM, INC., YOUSEF SIHWEIL and SAWSAN SIHWEIL, Defendants, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.* (hereinafter, "MWHL"); and unpaid wages, treble damages, interest, reasonable attorneys' fees and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.* (hereinafter, "MWPCL"), and in support thereof, state as follows:

## INTRODUCTION AND BACKGROUND

Defendants are in the business of selling mobile phones. Defendants are authorized dealers for Metro PCS and have operations across the country. They are a franchise dedicated to selling

low cost, "contract-free," service plans. Defendants have stores in Florida, Texas, Louisiana, South Carolina, Virginia and Pennsylvania. They operate twenty-two (22) stores in Maryland.

As part of their business model, Defendants staff their stores with sales associates and store managers. Sales associates and store managers have similar duties. Both sets of employees are primarily responsible for selling phones and related products.

Plaintiffs Amy Brailer ("Brailer") and Lauren Brown ("Brown") were sales associates. They were responsible for selling phone plans. Plaintiffs assisted customers with adding lines to preexisting plans. They also facilitated the purchase of family and other customized plans.

Plaintiffs were given daily sales goals. These goals centered on selling accessories, the means by which Defendants generated most of their revenues. Plaintiffs were required to promote the accessories. Their focus was to encourage customers to purchase accessories with their phones.

Plaintiff Kasey Dolch ("Dolch") was a store manager. This position carried all the obligations of a sales associate. As a store manager, Plaintiff Dolch was also required to monitor the cash register and maintain logistical records. She was in charge of monitoring inventory and managing customer relations. Her job duties included setting the schedules of sales associates and other employees. This was done at the discretion of Defendants.

Regardless of their title, Plaintiffs were subject to similar violations. These violations resulted from Defendants' illegal compensation schemes. The schemes centered on not properly paying Plaintiffs and other similarly situated employees for the excessive hours they worked. Due to chronic understaffing and a high turnover rate, Defendants routinely scheduled Plaintiffs and others similarly situated to work well over forty (40) hours each week. Plaintiffs who brought in higher sales were scheduled to work even more.

Other tasks also extended Plaintiffs' and other similarly situated employees' workday. For instance, because Plaintiff Dolch was required to open and close the store, she had to work whenever the store was open.

Defendants failed to compensate Plaintiffs and other similarly situated employees with overtime pay. They were never paid "time and a half" their regular rates of pay. This continued for the duration of their employment. It was Defendants' practice to only pay Plaintiffs and others similarly situated "straight time." On many occasions, Plaintiffs and other similarly situated employees were not paid at all for the hours they worked. This often occurred during the holiday season.

Defendants committed other violations. They regularly took substantial improper deductions from their employees' pay. The deductions were taken for a variety of reasons, most typically in response to product loss or damage. However, all of the deductions were improper. There was no legal basis for the deductions. The deductions were nothing more than a scheme to cheat Plaintiffs and other employees out of the compensation they earned. The deductions were for the sole purpose of increasing Defendants' own profits.

Plaintiffs regularly complained about the unlawful deductions. They also complained about their failure to receive overtime wages. Defendants ignored Plaintiffs' complaints and continued to pay Plaintiffs incorrectly.

Defendants' unlawful pay practices are widespread. Their practices are implemented at all of Defendants' stores. Defendants' pay practices conflict with the FLSA, MWHL and the MWPCL. This necessitated the filing of this action.

## THE PARTIES

1.      Plaintiff Amy Brailer (hereinafter, "Brailer") is an adult resident of Glen Burnie, Maryland.

2.      Plaintiff Lauren Brown (hereinafter, "Brown") is an adult resident of Glen Burnie, Maryland.

3.      Plaintiff Kasey Dolch (hereinafter, "Dolch") is an adult resident of Pasadena, Maryland.

4.      Defendant Clearcomm BaWa, Inc. (hereinafter, "Clearcomm BaWa") is an incorporated for profit business.

5.      Clearcomm BaWa's business is selling phones, service plans and accessories.

6.      Clearcomm BaWa is a licensed dealer of Metro PCS.

7.      Clearcomm BaWa is a local retailer for Defendant Clearcomm, Inc. (hereinafter, "Clearcomm").

8.      Clearcomm BaWa is a subsidiary of Clearcomm.

9.      There are numerous other Clearcomm subsidiaries whose practices are similar to those of Clearcomm BaWa.

10.     Defendant Yousef Sihweil (hereinafter, "Y. Sihweil") is an adult resident of Annapolis, Maryland.

11.     Y. Sihweil is a co-owner of Clearcomm BaWa.

12.     Y. Sihweil is heavily involved in the day-to-day operations of the Clearcomm chain.

13.     Plaintiffs regularly interacted with Y. Sihweil.

14.     Y. Sihweil was regularly present on the sales floor.

15.    At all times relevant, Defendant Y. Sihweil had a significant financial interest in the revenues generated by Clearcomm BaWa.

16.    Defendant Sawsan Sihweil (hereinafter, "S. Sihweil") is an adult resident of Annapolis, Maryland.

17.    S. Sihweil co-owns Clearcomm BaWa with Y. Sihweil.

18.    S. Sihweil is also heavily involved in the day-to-day operations of the Clearcomm chain.

19.    Plaintiffs regularly interacted with S. Sihweil.

20.    S. Sihweil was regularly present on the sales floor.

21.    During the relevant period, Defendant S. Sihweil had a significant financial interest in the revenues generated by Clearcomm BaWa.

22.    Defendants operate twenty-two (22) stores in Maryland.

23.    Defendants maintain stores at:

   a)    816 Largo Center Drive
         Largo, MD 20774

   b)    9125 Riggs Road
         Adelphi, MD 20783

   c)    10610 Baltimore Avenue
         Unit B
         Beltsville, MD 20705

   d)    2463 Chillum Road Suite
         A15
         Hyattsville, MD 20782

   e)    6000 Greenbelt Road
         Greenbelt, MD 20770

   f)    7553 Ritchie Highway
         Glen Burnie, MD 21061

g)      7387-A Baltimore Annapolis Boulevard
        Glen Burnie, MD 21061

h)      1640 Pennsylvania Avenue
        Baltimore, MD 21217

i)      3222 Greenmount Avenue
        Baltimore, MD 21218

j)      229 Howard Street
        Suite E201
        Baltimore, MD 21201

k)      114 Patapsco Avenue
        Brooklyn, MD 21225

l)      400 Lexington Street
        Baltimore, MD 21201

m)      224 N. Eutaw Street
        Baltimore, MD 21201

n)      5138 Park Heights Avenue
        Baltimore, MD 21215

o)      9846 Liberty Road,
        Randallstown, MD 21133

p)      7730 Wise Avenue
        Dundalk, MD 21222

q)      6901 Security Boulevard
        Suite 104
        Windsor Mill, MD 21244

r)      4739 Westland Boulevard
        Halethorpe, MD 21227

s)      8610 Washington Boulevard
        Suite 106
        Jessup, MD 20794

t)      2230 Veirs Mill Road
        Rockville, MD 20851

u)      9 W. Patapsco Boulevard

Baltimore, MD 21225

v)      821 Hungerford Drive
Rockville, MD 21225

w)      8800 Bel Air Road
Nottingham, MD 21236

24.      Due to the nature of their business, Defendants are subject to the FLSA, MWHL and the MWPCL. Defendants' business meets the definition of a retail or service establishment.

25.      Defendants' annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00). As such, Defendants are subject to the FLSA, MWHL and the MWPCL.

26.      Based on the duties that Plaintiffs performed, at all times relevant to this Complaint, Plaintiffs were engaged in interstate commerce.

27.      Plaintiffs worked for Defendants who, at all times throughout Plaintiffs' employment, met the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

28.      Plaintiff Brailer worked as a sales associate for Defendants. Her period of employment was from November 3, 2016 to January 13, 2017.

29.      Plaintiff Brown worked as a sales associate. Her period of employment was from October 21, 2016 to January 13, 2017.

30.      Plaintiff Dolch was employed as a store manager. Her period of employment was from October 21, 2016 to January 13, 2017.

31.      At all times relevant, Plaintiffs performed their duties at Defendants' Glen Burnie store, located at 7387-A Baltimore-Annapolis Boulevard.

32.      Plaintiffs and others similarly situated worked as non-exempt employees for Defendants.

33.     At all times relevant to this Complaint, Defendants controlled the administration of their business and set employee schedules, including the schedules of Plaintiffs and other similarly situated employees.

34.     Defendants were actively engaged in the management and direction of Plaintiffs and others similarly situated.

35.     Defendants possessed and exercised the authority to determine the hours worked by Plaintiffs and other similarly situated employees.

36.     Defendants had the authority to control Plaintiffs' tasks and the tasks of others similarly situated.

37.     Defendants had the power and authority to change the course of Plaintiffs' and others' duties.

38.     Plaintiffs and members of the putative class recognized Defendants' authority and obeyed Defendants' instructions.

39.     Defendants made all decisions relating to Plaintiffs' and other similarly situated employees' rates and method of pay.

## JURISDICTION AND VENUE

40.     Original jurisdiction in this Honorable Court is expressly provided by the FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

41.     Discretionary supplemental jurisdiction of Plaintiffs' Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiffs' federal claims are based.

42.     Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

43.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.  Additionally, Plaintiffs are residents of the State of Maryland and have been for the entirety of the relevant period.

44.     This Honorable Court has personal jurisdiction over Defendants; Defendants are incorporated under the laws of Maryland and Defendants conduct sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

45.     Defendant Clearcomm BaWa, Inc. (hereinafter, "Clearcomm BaWa") is a retailer that specializes in the sale of phones, service plans and accessories.

46.     Clearcomm BaWa is a subsidiary of Defendant Clearcomm, Inc. (hereinafter, collectively referred to as "Defendants").

47.     Defendants are licensed distributors of Metro PCS.

48.     Defendants staff a variety of employees to assist with their business.

49.     These employees include sales associates and store managers.

50.     From approximately November 3, 2016 to January 13, 2017, Plaintiff Brailer was employed with Defendants.  She was hired by Defendants' agent Kevin Maex (hereinafter, "Maex").

51.     Brailer was hired to perform sales work.  She held the position of sales associate for the entirety of her tenure.

52.     From approximately October 21, 2016 to January 13, 2017, Plaintiff Brown was employed with Defendants.  Maex was the agent who hired her as well.

53.     Brown was also hired to perform sales work.  She held the position of sales associate for the duration of her employment.

54.     From approximately October 21, 2016 to January 13, 2017, Plaintiff Dolch was employed with Defendants.  She was also hired by Maex.

55.     Dolch's primary responsibilities involved sales work, although she had additional responsibilities as well.   These responsibilities were specific to her role as store manager.  She performed this role for the entirety of the relevant period.

56.     Plaintiffs' duties were performed at Defendants' Glen Burnie store.

57.     Charles Ostrander (hereinafter, "Ostrander") was the supervisor at the store. As such, he was Plaintiffs' common superior. Plaintiffs communicated with Ostrander on a regular basis.  Ostrander was frequently present at the store.

58.     Defendants Y. Sihweil and S. Sihweil (hereinafter, also collectively referred to as "Defendants") were also frequently present at the store in their capacity as owners of the Clearcomm franchise.

59.     Defendants regularly oversaw Plaintiffs' work.

60.     Defendants regularly performed inspections at the store.

61.     Plaintiffs and others similarly situated were routinely audited.

62.     The audits were designed to find any irregularities in sales. They consisted of a thorough inspection of the store and its inventory. Defendants reviewed store inventory records in order to monitor sales.

63.     Plaintiffs' tasks centered on sales. Their primary duties consisted of the sale of phone plans.

64.     Defendants offer their customers a variety of monthly plans. The plans are differentiated based on the available features, including the number of minutes, text and data usage. The extent of these features determines the price of the plans.

65.     Plaintiffs were required to encourage customers to purchase more expensive plans. Defendants enforced this policy for the entirety of Plaintiffs' employment.

66.     Plaintiffs were also responsible for assisting customers that wanted to add a line to their existing plans. Plaintiffs provided similar support to customers that wanted to create family plans.

67.     Plaintiffs were required to attempt to convince customers to purchase the most expensive options available. Defendants constantly reminded Plaintiffs of how important this was.

68.     Defendants also stressed the importance of the sale of accessories. Defendants offered a variety of phone accessories to their customers. This includes chargers, cases and earphones. The sale of these accessories represented a substantial portion of Defendants' profits, leading Defendants to strongly incentivized their sale.

69.     Plaintiffs were also responsible for leading customers through the return process. This process often took several hours to complete; it was designed to be lengthy. The length served its intended purpose of discouraging customer returns.

70.     Plaintiffs and others similarly situated were all responsible for inventory-related issues. They had to keep detailed inventory records. While store managers were supposed to be the only employees to monitor inventory, in practice, all of Defendants' employees were equally responsible. This includes all of Defendants' sales associates.

71.     There were persistent issues with the store's inventory. For example, it was common for Defendants' products to have defects. Accessories often did not function appropriately. They were often already broken upon their delivery to the store. Even though these problems were outside of Plaintiffs' control, it was Defendants' practice to blame Plaintiffs and others similarly situated for issues with the products.

72.     In her capacity as store manager, Plaintiff Dolch had additional responsibilities. These responsibilities often extended her workday. She was required to open and close the store each day. She was also required to monitor the cash register.

73.     Dolch was also supposed to hire new employees. However, in practice, she was not actually permitted to make such hires.

74.     Dolch had limited autonomy. Defendants and their agents were the true managers of the store. Defendants and Ostrander routinely interfered with Dolch's managerial responsibilities. She was constantly monitored by Defendants and other management officials. She had little actual authority over the store.

75.     For instance, Plaintiff Dolch was supposed to design employee schedules. However, her proposed schedules were frequently modified by Ostrander, who would typically provide Dolch with the schedules he created. Dolch was required to implement these schedules. She had little to no discretion in this area.

76.     Although she was given the title of manager, Plaintiff Dolch was essentially a sales associate.  Store managers were given a few extra tasks.  These tasks often resulted in store managers having to work longer hours.

77.     While on the sales floor, Defendants demanded that their store managers focus on sales.  Accordingly, Plaintiff Dolch was required to fulfill all of the responsibilities attributable to the position of sales associate. Her responsibilities were generally the same as Plaintiffs Brailer and Brown.

78.     Dolch was also paid in a similar manner as Plaintiffs Brailer and Brown.[1]

79.     Plaintiffs were all paid an hourly rate.

80.     Plaintiffs all received nine dollars ($9.00) per hour.

81.     Plaintiffs had no control over the manner in which they were paid.

82.     Plaintiffs also did not possess any control over their schedules.

83.     Plaintiffs were required to follow the schedules they were given.

84.     Defendants and other management officials administered Plaintiffs' schedules.

85.     Due to chronic understaffing, Plaintiffs were required to work substantially more than forty (40) hours each week. However, Plaintiffs were not compensated for working these additional hours. Plaintiffs failed to receive proper overtime payments for the duration of their employment.

86.     Plaintiff Dolch was expected to work seven (7) days a week.  She frequently worked twelve (12) hour days.  It was routine for Plaintiff Dolch to work in excess of eighty-four (84)

---

[1] For the first ninety (90) days of her employment, Plaintiff Dolch was paid an hourly rate.  Defendants subsequently began to pay Plaintiff Dolch a salary.

hours each week. However, Plaintiff Dolch was only paid "straight time" for these hours. She never received "time and a half" her regular rate of pay.

87. Plaintiff Brown frequently worked fifty (50) hours per week. There were times when she worked even more. Defendants failed to pay Plaintiff Brown correctly for the overtime hours she worked. She was never paid at a rate of "time and a half" for all hours worked over forty (40) in a week. For the majority, she was only paid "straight time" for all hours worked. There were times when Plaintiff Brown did not even receive her regular rate. Defendants stopped paying Plaintiff Brown altogether for all the hours she worked.

88. On approximately January 1, 2017, Defendants began to pay Plaintiff Brown for only thirty-two (32) hours of work each week. Despite this fact, her schedule did not appreciably change. Defendants simply stopped paying Plaintiff Brown for all of her regular hours.

89. Plaintiff Brailer was subject to these same conditions. Plaintiff Brailer frequently worked sixty (60) hours per week. She was consistently scheduled to work seven (7) days a week. Brailer never received overtime payments for the hours she worked over forty (40) in a week. She only received her regular rate for the overtime hours she worked.

90. After January 1, 2017, the number of hours Plaintiff Brailer was paid for was also substantially reduced. Defendants just stopped paying Brailer for many of the hours she worked. She failed to receive wages for multiple hours, including both regular and overtime hours worked.

91. There was no reason for Plaintiffs Brailer and Brown to have not been paid for all hours worked. There was no reason for any of the Plaintiffs to have not been paid correctly for their overtime hours worked. Because of Defendants' illegal pay practices, Plaintiffs and others similarly situated were all cheated out of numerous hours of regular compensable time, as well as overtime premiums.

92.     Defendants were well aware of the excessive hours that Plaintiffs worked.  Those hours were part of Plaintiffs' regular schedules and were tracked by Defendants' time keeping software.

93.     Plaintiffs had to utilize Defendants' time keeping software.  Plaintiffs were issued five (5) digit employee identification numbers.  Upon their arrival at work each morning, Plaintiffs were required to use their numbers to "clock in."  They also utilized their identification numbers to "clock out" at the end of each shift.  Thus, Defendants knew that Plaintiffs consistently worked more than forty (40) hours per week.

94.     Plaintiffs frequently complained regarding their failure to receive proper overtime wages.  They also consistently complained about their failure to be compensated for the regular hours they worked. These complaints were often made to Defendants S. Shiweil and Y. Sihweil. Plaintiffs also complained to other upper management officials.

95.     Despite their complaints, Plaintiffs never received any overtime payments. Plaintiffs never received "time and a half" pay for any hours worked over forty (40) in a workweek. They were also never compensated at all for the multiple regular hours they worked.

96.     Plaintiffs also failed to receive payments for other wages they earned. These payments were supposed to be in the form of commissions. This was based on a commission structure implemented by Defendants. The structure centered on the sale of phone accessories. Defendants promised they would pay larger commissions for the sale of accessories compared to the sale of phones.   However, Defendants rarely paid Plaintiffs properly for their owed commissions.

97.     Defendants implemented a scheme which took substantial deductions from Plaintiffs' earnings.  These deductions substantially reduced Plaintiffs' commissions, in addition

to their base salaries. While the deductions occurred for a number of reasons, they invariably resulted from circumstances outside of Plaintiffs' control. For instance, the deductions were primarily based on damage sustained by the phones or accessories, even though products were often damaged upon their arrival to the store.

98.     Theft of the store inventory was another basis for the deductions. Once again, Plaintiffs had no control over these thefts.

99.     The deductions also resulted from shortages to the cash register, in which Defendants often alleged receiving counterfeit bills. Plaintiffs had no control over shortages to the cash register. Defendants' receipt of counterfeit bills had no relation to Plaintiffs' employment.

100.     Defendants were well aware that Plaintiffs had no control over issues regarding theft of the property, inventory damage or shortages to the cash register. Nevertheless, Defendants exploited these issues to cheat Plaintiffs out of their pay. Defendants used their routine audits to find reasons to make deductions from Plaintiffs' and other similarly situated employees' wages.

101.     The deductions were itemized separately on Plaintiffs' paychecks. However, Plaintiffs and others similarly situated typically didn't know the reasons for the deductions. The deductions were entirely arbitrary.

102.     The deductions were often for large sums, sometimes as much as hundreds of dollars.

103.     Even though products were almost never sold for their full value, it was always Defendants' practice to deduct the full value of any products that were damaged or stolen.

104.     For instance, Defendants would claim that a deduction was based on damage or theft of a particular accessory. Defendants would deduct the full value of the accessory from

Plaintiffs' paychecks. This occurred even though the accessory was routinely sold for substantially less.

105.     Plaintiffs and others similarly situated were often not even made aware of which damaged or stolen items Defendants used to account for the deductions on their paychecks. The period in which an item was allegedly damaged or stolen did not even have to occur during Plaintiffs' and other similarly situated employees' shifts. Regardless, their paychecks were still reduced as a matter of course.

106.     There was no pre-determined formula in regard to the deductions that Defendants imposed, nor was there anything to protect Plaintiffs from the deductions. Defendants acted only to ensure that they themselves would not have to pay for any losses.

107.     The same criteria applied when it came to shortages to the cash register. Defendants would routinely deduct Plaintiffs' and other similarly situated employees' paychecks based on alleged irregularities with the cash in the register. Plaintiffs can recall occasions when Defendants claimed counterfeit bills had been found in the register. To prevent any alleged losses that resulted from the counterfeit bills, Defendants deducted the entire value of all cash in the register from Plaintiffs' collective paychecks.

108.     There was no basis for these and other similar deductions. The deductions from Plaintiffs' paychecks were nothing more than organized theft. The deductions were completely illegal.

109.     The deductions were nothing but a scheme designed by Defendants to maximize their own profit at the expense of their employees. Defendants' scheme regularly prevented Plaintiffs from receiving their full base pay.

110. Plaintiffs routinely complained to Defendants regarding this scheme. Plaintiffs consistently complained about the wages missing from their paychecks as a result of the illegal deductions. Plaintiffs' complaints were met with a series of excuses. Defendants never compensated Plaintiffs properly for the commissions they rightfully earned. Through the improper deductions, Defendants continued to cheat Plaintiff out of their wages.

111. There is no bona fide dispute that the deductions Plaintiffs were subject to were unlawful.

112. There is no bona fide dispute that Plaintiffs should have been paid overtime wages for all hours worked over forty (40) in a workweek.

113. There is no bona fide dispute that Plaintiffs should have received their regular rate of pay for all time worked.

114. In bad faith, Defendants withheld these wages.

115. Defendants failed altogether to compensate Plaintiffs and other similarly situated employees correctly for the work they performed.

116. Defendants designed and enforced their unlawful pay policies.

117. Defendants were well aware of the illegal deductions taken from Plaintiffs' paychecks.

118. Defendants were well aware of the overtime hours worked by Plaintiffs.

119. Defendants suffered and/or permitted Plaintiffs to work these overtime hours.

120. Due to their many grievances, on January 13, 2017, Plaintiffs collectively decided to leave their employment with Defendants.

121. Subsequent to their departure, Plaintiffs did not receive their last paycheck for several weeks. Upon receiving their final paychecks, Plaintiffs noticed they were still missing

payments.  Plaintiffs noticed that their final paychecks were subject to substantial improper deductions.  Plaintiffs' final paychecks also did not include additional payments to account for the unlawful deductions that occurred during their tenure.[2]  Their final checks also did not include payments to account for the missing wages that accrued over the course of their employment.

122.  Consequently, on behalf of themselves and all those similarly situated, Plaintiffs seek all wages to which they are entitled and all other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

123.  Plaintiffs and other similarly situated employees work or worked as sales associates and store managers for Defendants.

124.  The FLSA requires employers to compensate non-exempt employees such as Plaintiffs and others similarly situated with at least the minimum wage for each hour of work.

125.  The FLSA requires employers to compensate non-exempt employees such as Plaintiffs and others similarly situated with overtime wages for all hours worked over forty (40) within a workweek.

126.  Defendants knew that Plaintiffs and similarly situated employees typically worked over forty (40) hours per week.

127.  Defendants suffered or permitted Plaintiffs and other similarly situated employees to work more than forty (40) hours per week.

128.  Defendants knew that Plaintiffs and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

---

[2] Due to her continued complaints for missing wages, Plaintiff Dolch subsequently received a check from Defendants for the sum of one hundred and twenty dollars ($120.00).  This amount does not come close to covering the wages she is owed.

129.    Defendants denied Plaintiffs and other similarly situated employees payment for all hours worked.

130.    Plaintiffs and others similarly situated failed to be compensated at all for many hours of work they performed.

131.    Plaintiffs and others similarly situated failed to receive overtime payments when they worked in excess of forty (40) hours in a week.

132.    Pursuant to the FLSA, Plaintiffs commence this collective action against Defendants on behalf of themselves and all those similarly situated.

133.    Plaintiffs demand damages reflecting at least the federal minimum wage for each hour of work they performed.

134.    Plaintiffs demand damages reflecting an overtime rate of not less than one and a half (1.5) times their regular rate of pay for all hours worked over forty (40) in any workweek.

135.    Plaintiffs make these same demands on behalf of all members of the putative collective class.

136.    Plaintiffs consent to be party plaintiffs in this matter.

137.    Plaintiffs' consent forms are attached to this Complaint as Exhibit A, B and C.

138.    It is likely that other individuals will join Plaintiffs during the litigation of this matter and file written consents to "opt in" to this collective action.

139.    There are similarly situated current and former employees of Defendants that have been harmed by Defendants' common scheme to underpay their employees and violate the FLSA.

140.    These similarly situated persons are known to Defendants and are readily identifiable through Defendants' records.

141.    Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

142.    Upon information and belief, others will choose to join Plaintiffs in this action against Defendants and opt in to this lawsuit to recover unpaid wages and other available relief.

## CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS

143.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other current and former employees that served as sales associates and store managers and were denied minimum and overtime wages owed to them under MWHL.  Plaintiffs are members of the proposed class they seek to represent.  Plaintiffs and other similarly situated employees performed the same duties and were subject to the same unlawful payment practices.

144.    *Numerosity:* The individuals in the putative class are so numerous that joinder of all members is impracticable.  Although the precise number of such individuals is currently unknown, the putative class includes numerous employees who are readily identifiable through Defendants' pay records.  As detailed in the Complaint, there was also a high turnover rate at Defendants' stores, which increased the number of employees that Defendants employed during the relevant period.  Defendants operate twenty-two (22) stores in Maryland. Defendants operate approximately seventy-five (75) stores in total.  Upon information and belief, the total number of similarly situated employees subject to the payment practices outlined above is likely over three hundred (300). Thus, numerosity exists.

145.    *Commonality:* There are questions of law and fact common to the putative class. Among the common questions of law and fact applicable to Plaintiffs and the putative class are:

a. Whether the putative class is similarly situated because they all performed the same basic duties and assignments and were subject to Defendants' common policy and practice of not paying them for all hours worked, in addition to overtime compensation;

b. Whether Defendants employed the putative class within the meaning of MWHL;

c. Whether Defendants violated MWHL by failing to pay the putative class wages amounting to at least the minimum wage for all hours worked;

d. Whether Defendants violated MWHL by failing to pay the putative class overtime compensation for hours worked in excess of forty (40) hours per workweek;

e. Whether Defendants' violations of MWHL were willful; and

f. Whether Defendants are liable for damages claimed herein, including but not limited to, compensatory, liquidated or treble, statutory, interests, costs and attorneys' fees.

146. *Typicality:* Plaintiffs' claims are typical of those of the putative class. Specifically, each and every class member worked at one of Defendants' stores. The putative class was not paid their regular rate of pay for multiple hours worked. The putative class failed to receive overtime compensation when they worked over forty (40) hours in a week. As a result, each and every class member suffered the same harm. This is a direct violation of MWHL.

147. *Adequacy:* Plaintiffs will fully and adequately protect the interests of the putative class. Plaintiffs seek the same recovery as the class. This is predicated upon the same violations of law and the same damage theories. Counsel for the proposed class are qualified and experienced

in litigating MWHL class actions and other complex litigation matters. Furthermore, counsel are capable of providing adequate representation for all members of the proposed class. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the class.

148. *Predominance:* The common issues of law and fact predominate over any individual issues. Each putative class member's claim is controlled by Maryland's wage and hour statutory scheme. They are also based on the same set of facts in regard to Defendants' failure to pay minimum and overtime wages as required by MWHL. Similarly, the damages are eminently certifiable. Defendants' records will provide the amount each class member was paid and the amount of time each class member worked.

149. This action is maintainable as a class action. The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class. This would establish incompatible standards of conduct for Defendants. If they were to pursue their claims separately, the numerous adjudications that would be required to protect the individual interests of the putative class members would constitute a burden on judicial resources. A class action is superior to other available methods for the fair and efficient adjudication of this case and will serve to promote judicial economy to the benefit of this Court, as well as the involved parties. Accordingly, the Court should certify the proposed class.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### Count I - Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiffs and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff

150.   Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

151.   Plaintiffs are entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

152.   As described above, Plaintiffs have not received from Defendants compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week; Defendants failed to compensate Plaintiffs for these additional hours.

153.   Defendants willfully and intentionally failed to compensate Plaintiffs for the overtime wages they are owed.  There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendants.

154.   Under the FLSA, Plaintiffs are entitled to additional wages from Defendants to compensate them for hours worked in a workweek in excess of forty (40) at a rate of one and one-half (1.5) times Plaintiffs' regular hourly wage rate.

### *Count II. Violation of the FLSA:  Failure to Pay the Minimum Wage to Plaintiffs and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff*

155.   Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

156.   Pursuant to the Fair Labor Standards Act, 29 U.S.C. § 206, each employer shall pay wages at a rate that is no less than the federal minimum wage, currently amounting to seven dollars and twenty-five cents ($7.25) per hour.

157. Plaintiffs have not received compensation from Defendants reflecting the prescribed minimum wage rate for all hours worked for Defendants; rather, Defendants unlawfully failed to ensure that Plaintiffs received at least the minimum wage rate for each hour of work.

158. Defendants willfully and intentionally did not compensate Plaintiffs for the total minimum amount of wages they are owed.

159. There is no bona fide dispute that Plaintiffs are not exempt from the minimum wage provisions of the FLSA for the work they performed for Defendants.

160. Under the FLSA, Plaintiffs are entitled to additional wages from Defendants for all hours worked at a rate of pay no less than the federal minimum wage.

***Count III.  Violation of MWHL: Failure to Pay Overtime Wages to Plaintiffs, all those that are Joined as Party Plaintiffs in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

161. Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

162. Pursuant to Maryland Labor and Employment Code Ann. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate; furthermore, pursuant to Maryland Labor and Employment Code Ann. § 3-420(a), an employer shall compute the wage for overtime under § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

163. Plaintiffs have not received compensation from Defendants reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

164. Defendants willfully and intentionally did not compensate Plaintiffs for the overtime wages they are owed.  There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendants.

165.     Under MWHL, Plaintiffs are entitled to additional wages from Defendants for all overtime hours worked at a rate of one and one-half (1.5) times Plaintiffs' regular hourly wage rate.

***Count IV.  Violation of MWHL: Failure to Pay the Minimum Wage to Plaintiff, those that are Joined as Party Plaintiffs in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

166.     Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

167.     Pursuant to Maryland Wage and Hour Law, Maryland Labor and Employment Code Ann. § 3-415, each employer shall pay wages at a rate that is no less than the federal minimum wage, currently amounting to seven dollars and twenty-five cents ($7.25) per hour.  In Maryland, the minimum wage is currently set at eight dollars and seventy-five cents ($8.75) per hour.

168.     Plaintiffs have not received compensation from Defendants reflecting the prescribed minimum wage rate for all hours worked for Defendants; rather, Defendants unlawfully failed to ensure that Plaintiffs received at least the minimum wage rate for each hour of work.

169.     Defendants willfully and intentionally did not compensate Plaintiffs for the total minimum amount of wages they are owed.

170.     There is no bona fide dispute that Plaintiffs are not exempt from the minimum wage provisions of MWHL for the work they performed for Defendants.

171.     Under MWHL, Plaintiffs are entitled to additional wages from Defendants for all hours worked at a rate of pay no less than the minimum wage.

***Count V - Violation of the MWPCL: Failure to Pay Wages Owed at the Termination of Their Employment to Plaintiff, all those that are Joined as Party Plaintiffs in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

172.     Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

173.     Plaintiffs are entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501, *et. seq.*, which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.  Under the MWPCL, "wages" include the commission payments that Plaintiffs are owed. Md. Code Ann., Lab. & Empl. §§ 3-501(c)(1-2).

174.     In accordance with MWPCL §3-505(a), Plaintiffs have not received compensation from Defendants for all wages owed for work performed before the termination of their employment.  This is specific to Defendants' failure to pay Plaintiffs the regular and overtime wages to which they are entitled.   This is also specific to the commission payments that Plaintiffs are owed as a result of the illegal deductions taken from their pay.

175.     Defendants willfully and intentionally did not compensate Plaintiffs for all the wages owed to them and continued to violate the MWPCL, even after Plaintiffs informed Defendants of the violation.

176.     Under the MWPCL, there is no bona fide dispute that Plaintiffs are owed wages and commissions for work performed while employed by Defendants.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and others similarly situated, pray for the following relief:

a)      In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiffs and those similarly situated;

b)   Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names, addresses and emails of all those individuals who are similarly situated and permitting Plaintiffs to send notice of this action to all those similarly situated individuals;

c)   Designating the named Plaintiffs to act as a class representative on behalf of all similarly situated employees for the FLSA collective class;

d)   Judgment against Defendants for their failure to pay Plaintiffs, members of the putative collective class and those appropriately joined to this matter in accordance with the standards set forth by the FLSA;

e)   Judgment against Defendants for their failure to pay Plaintiffs and those appropriately joined to this matter in accordance with the standards set forth by MWHL;

f)   Judgment against Defendants for their failure to pay Plaintiffs and those appropriately joined to this matter in accordance with the standards set forth by the MWPCL;

g)   Judgment against Defendants and classifying their conduct as willful and not in good faith;

h)   Judgment against Defendants and classifying Plaintiffs, the collective class and those appropriately joined in this matter as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

i)   An award against Defendants for the amount of unpaid overtime wages owed to Plaintiffs and those similarly situated, calculated at a rate that is not less than one and a half (1.5) times Plaintiffs' and other similarly situated employees' regular hourly rate for all overtime hours worked;

j)   An award against Defendants for the amount of deducted wages owed to Plaintiffs and those similarly situated;

k)   An award against Defendants reflecting outstanding minimum wages owed to Plaintiffs and those similarly situated;

l)   An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiffs, those similarly situated and those properly joined in this matter, whichever is deemed just and equitable by this Honorable Court;

m)   Injunctive relief in the form of an order prohibiting Defendants from violating the FLSA, MWHL and the MWPCL in the future;

n)   An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendants;

o)   Leave to add additional parties to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

p)   All further relief deemed just and equitable by this Honorable Court.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request that a jury of their peers hear and decide all possible claims brought on behalf of Plaintiffs and those similarly situated.

Respectfully submitted,

*/s/ Benjamin L. Davis, III*
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
George E. Swegman, Esq. (19444)
gswegman@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:   (410) 244-8454

*Attorneys for Plaintiffs*